# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
### WHITE PLAINS DIVISION

| | |
|---|---|
| **DOLORES GAY AND CORINNE JACOB,** *on behalf of themselves and all others similarly situated*, | **Judge** |
| | **Case No.** |
| **Plaintiffs,** | |
| | **JURY TRIAL DEMANDED** |
| **v.** | |
| **GARNET HEALTH,** | |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

Plaintiffs Dolores Gay and Corinne Jacob (collectively "Plaintiffs") bring this action in their individual capacity and on behalf of all others similarly situated against Defendant Garnet Health ("Garnet" or "Defendant"), and alleges, upon personal knowledge as to their own actions, their counsel's investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiffs brings this case to address Defendant's illegal and widespread practice of disclosing Plaintiffs' and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook").

2. Defendant owns and controls the website https://www.garnethealth.org/, along with the Garnet Health MyChart Account portal which can be accessed from the website (collectively, the "Website"). Through the Website, patients can access information about various conditions and treatments, Defendant's numerous locations and the practitioners at each location, and other general information about Defendant and the services it offers to its patients. The Website also

1

contains a search bar where patients can enter questions, symptoms, conditions, practitioner names, and other queries to obtain relevant and responsive information. Critically, patients can also access their MyChart Patient Account through the Website, which contains other aspects of patients' PII and PHI.

3.      Defendant installed and implemented the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") on its Website, which secretly enables the unauthorized transmission and disclosure of Plaintiffs' and Class Members' PII and PHI as it is communicated to Defendant.

4.      Based on Defendant's use of the Pixel, and evidence demonstrating that the information transmitted via the Pixel was indeed linked to Plaintiffs' personal Facebook account, Plaintiffs assert Defendant also installed and implemented the Facebook Conversions Application Programming Interface ("Conversions API") on its Website.

5.      By implementing Conversions API, Defendant secretly enabled additional unauthorized transmissions and disclosures of Plaintiffs' and Class Members' Private Information.[1]

6.      More specifically, Defendant's Website directs Plaintiffs' and Class Members' communications to automatically and surreptitiously be sent to Facebook's servers. This occurs on every webpage on which Defendant has installed the Tracking Pixel and Conversions API.[2]

---

[1] "Conversions API works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited: January 25, 2023).

[2] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited: January 27, 2023).

7.     Thus, operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiffs and Class Members submit to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").

8.     Similarly, Conversions API stores Plaintiffs' and Class Members' Private Information from visiting Defendant's Website and transmits it to Facebook.

***Tracking Pixel***

9.     A pixel is a piece of code that "tracks the people and [the] type of actions they take"[3] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), and more.

10.    The User's web browser executes the Pixel via instructions within the Defendant's webpage to communicate directly to Facebook certain parameters defined by the Defendant.

11.    The pixel can share the user's Facebook User ID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser.[4] Cookies are only transmitted to the owner site from the user's web browser and cannot be accessed by any other site.

12.    The Facebook Pixel is programmable, meaning that the Defendant controls which of its webpages contain the Pixel and which events are tracked and transmitted to Facebook.

13.    Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Upon information and belief,

---

[3] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Nov. 14, 2022).
[4] "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited: January 27, 2023).

Defendant utilized the Pixel data for marketing purposes in an effort to bolster its profits. Facebook also uses Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions, symptoms, and treatments, and other information disclosed to Defendant.

***Conversions API***

14.     The Facebook Conversions API allows businesses and companies to send web events from their servers to Facebook.[5]

15.     Conversions API is designed to create a direct and reliable connection between marketing data (such as website events and offline conversions) from Defendant's server to Facebook.[6] In doing so, Defendant stores Plaintiffs' and Class Members' Private Information on Defendant's own server and then transmits it to Facebook.

16.     Conversions API is an alternative method of tracking versus the Pixel because no privacy protections on the user's end can defeat it. This is because it is implemented Server-Side, rather than executed by Users' web browsers.

17.     Because Conversions API is Server-Side, it cannot access the Facebook Cookie to retrieve the Facebook User ID.[7] Therefore, other round-about methods of linking the user to their Facebook account must be employed.[8]

---

[5] https://revealbot.com/blog/facebook-conversions-api/ (last visited: January 24, 2023).

[6] https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited: January 25, 2023).

[7] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses, and phone numbers, that we use for matching purposes only." https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited: January 27, 2023).

[8] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/conversions-api/best-

18.     Facebook has an entire page within their developers' website about how to de-duplicate data received when both a Pixel is executed as well as Conversions API.[9]

19.     Conversions API tracks the user's website interaction, including Private Information, and then transmits this data to Facebook. Indeed, Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."

***Purpose of this Lawsuit***

20.     Accordingly, this case arises from Defendant's intentional, reckless, and/or negligent disclosure of Plaintiffs' and Class Members' confidential and private medical information to Facebook.

21.     The information that Defendant's Tracking Pixel and Conversions API sent to Facebook included Private Information that Plaintiffs and Class Members submitted to Defendant's Website, including for example, the type of medical treatment sought, the particular health condition, and the fact that the individual attempted to or did book a medical appointment. Such Private Information would allow a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. This type of disclosure could also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, dementia, or HIV.

---

practices/#req-rec-params (last visited: January 27, 2023).
[9] https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events (last visited: January 27, 2023).

22.     Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers who geotarget Plaintiffs' and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and Conversions API.

23.     For instance, Plaintiffs submitted medical information to Defendant's Website and used the Website to schedule appointments with healthcare professionals, communicate with their doctors and communicate Private Information, complete patient web forms, and review medical healthcare and billing records.

24.     Shortly thereafter, this information was communicated from Defendant's Website to Facebook.

25.     Defendant regularly encourages Plaintiffs and Class Members to use its digital tools, including its Website, to receive healthcare services. Plaintiffs and Class Members provided their Private Information through Defendant's Website with the reasonable understanding that Defendant would secure and maintain any PII and PHI as confidential.

26.     At all times Plaintiffs and Class Members visited and utilized Defendant's Website, they had a reasonable expectation of privacy in the Private Information collected through Defendant's Website, including that it would remain secure and protected and only utilized for medical purposes.

27.     Plaintiffs and Class Members provided Private Information to Defendant in order to receive medical services rendered and with the reasonable expectation that Defendant would protect their Private Information. Plaintiffs and Class Members relied on Defendant to secure and protect the Private Information and not disclose it to unauthorized third parties without their knowledge or consent.

28.     Defendant further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchange with Defendant.

29.     Defendant owed common law, contractual, statutory, and regulatory duties to keep Plaintiffs' and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

30.     Defendant, however, failed in its obligations and promises by utilizing the Facebook Pixel and Conversions API, described below, on its Website knowing that such technology would transmit and share Plaintiffs' and Class Members' Private Information with Facebook.

31.     While Defendant willfully and intentionally incorporated the Tracking Pixel and Conversions API into its Website, Defendant never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications via the Website with Facebook. As a result, Plaintiffs and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook as they communicated their healthcare information and other Private Information via the Website.

32.     Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the consent of Plaintiffs and Class Members to disclose their Private Information to Facebook or others; (iv) failing to take steps to

7

block the transmission of Plaintiffs' and Class Members' Private Information through Facebook Pixels; (v) failing to warn Plaintiffs and Class Members; and (vi) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

33.    Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of benefit of the bargain, (iv) diminution of value of the Private Information, (v) statutory damages, and (vi) the continued and ongoing risk to their Private Information.

34.    Plaintiffs seek to remedy these harms and bring causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) invasion of privacy; (4) breach of implied contract; (5) unjust enrichment; (6) negligence; and (7) violation of the New York Consumer Law for Deceptive Acts and Practices Gen. Bus. Law § 349.

## PARTIES

### Plaintiff Corinne Jacob

35.    Plaintiff is a natural person and citizen of Port Jervis, New York where she intends to remain. On numerous occasions, Plaintiff accessed Defendant's Website. Plaintiff used the Website to find and obtain medical treatment. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook, and this data included her PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

36.    Plaintiff is a current patient of Garnet Health. Plaintiff has been one of Defendant's patients for several years, receiving urgent care, testing, and specialist services since from Garnet since it became known as Garnet Health. Plaintiff has used the Website numerous times since she first engaged Defendant for healthcare services.

37.    Plaintiff Jacob has used Defendant's primary website, garnethealth.org, to book medical appointments; search for specific doctors and specialists; used the Website's search bar to research symptoms, medical conditions, and treatments; complete patient web forms (such as treatment authorization forms); and review healthcare records including test results.

38.    Plaintiff Jacob has used both her mobile phone and her home computer to access Defendant's Website via a web browser (Firefox on the home computer and Safari on the mobile phone). She visits the primary Website several times per year, most recently to search for an endocrinologist in May 2023.

39.    Plaintiff Jacob has also used Defendant's MyChart Patient Portal through the Website. Plaintiff estimates that she uses this feature several times per year, and potentially more frequently when she is using the urgent care or testing services that Defendant provides.

40.    Plaintiff has used the MyChart Portal component of the Website to: contact and communicate with her physicians, doctors, and healthcare professionals; complete patient medical forms; and review healthcare records, such as prescriptions, test results, and bills.

41.    As Defendant's patient, Plaintiff Jacob reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private

Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed her Private Information to Defendant.

42.    During her time as a patient, Plaintiff Jacob never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook or Google, to access or interpret such information.

43.    Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted Plaintiff Jacob's Private Information to third parties, such as Facebook and Google.

44.    Plaintiff Jacob has been a regular Facebook user since roughly 2008 and is also an active user of Instagram.

45.    Plaintiff uses her mobile phone to access both Facebook and Instagram via the platforms' apps. Plaintiff also used her home computer to access her Facebook account via the Firefox web browser. Plaintiff spends roughly one hour per day on Instagram and roughly two hours per day on Facebook.

46.    Shortly after using Defendant's Website Plaintiff has seen numerous targeted advertisements on Facebook related to her medical conditions and treatments sought through Garnet Health. Specifically, Plaintiff used Defendant for a breast biopsy procedure. Subsequent to visiting Defendant's Website to view her test results, Plaintiff began seeing advertisements related to the treatment of breast cancer.

### Plaintiff Dolores Gay

47.    Plaintiff is a natural person and citizen of South Salem, New York, where she intends to remain. On numerous occasions, Plaintiff accessed Defendant's Website. Plaintiff used the Website to find and obtain medical treatment. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook, and this data included her PII,

10

PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

48.     Plaintiff is a current patient of Garnet Health. Plaintiff has been one of Defendant's patients since 2017. She uses Garnet for her primary care, specialty care, and cancer care. Plaintiff has used the Website numerous times since she first engaged Defendant for healthcare services.

49.     Plaintiff Gay has used Defendant's primary website, garnethealth.org, to: book medical appointments; search for specific doctors and specialists; used the Website's search bar to research symptoms, medical conditions, and treatments; contact her physician and healthcare providers; complete patient web forms (such as treatment authorization forms); and review healthcare records including test results.

50.     Plaintiff Gay has used her mobile phone, laptop, and work and home computers to access Defendant's Website via a web browser.

51.     Plaintiff Gay has also used Defendant's MyChart Patient Portal through the Website. Plaintiff uses this feature several times per week, due to her condition and the services she receives from Defendant.

52.     Plaintiff has used the MyChart Portal component of the Website to: book an appointment; contact and communicate with her physicians, doctors, and healthcare professionals; complete patient medical forms; and review healthcare records, such as prescriptions, test results, and bills.

53.     As Defendant's patient, Plaintiff Gay reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such

11

communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed her Private Information to Defendant.

54.     During her time as a patient, Plaintiff Gay never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook or Google, to access or interpret such information.

55.     Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted Plaintiff Gay's Private Information to third parties, such as Facebook and Google.

56.     Plaintiff Gay has been a regular Facebook user since the early 2000's and is also an active user of Instagram.

57.     Plaintiff uses her mobile phone to access both Facebook and Instagram via the platforms' apps. Plaintiff also uses her home computer to access her Facebook account. Plaintiff checks both her Facebook and Instagram accounts multiple times per day.

58.     Shortly after using Defendant's Website Plaintiff has seen numerous targeted advertisements on Facebook related to her medical conditions and treatments sought through Garnet Health.

### *Defendant Garnet Health*

59.     Defendant Garnet Health is a domestic not-for-profit corporation, incorporated under the laws of the state of New York. Defendant's primary campus and headquarters are located at 707 East Main Street, Middletown, New York 10940.

60.     Defendant is one of New York's largest healthcare networks, with locations in and around New York City, as well as throughout the surrounding area. It exists as the parent to

organizations currently or previously known as the Greater Hudson Valley Health System, Carnet Health Medical Center – Catskills, Garnet Health Medical Center, Garnet Health Doctors, and the Garnet Health Foundation.

61.     Defendant provides healthcare services to approximately 450,000 residents throughout Orange, Sullivan, and Ulster Counties, employing more than 4,000 healthcare professionals and more than 850 medical staff members.

62.     Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 "HIPAA").

## JURISDICTION & VENUE

63.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

64.     This Court has federal question jurisdiction under 29 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (28 U.S.C. § 2511, *et seq.*, and 28 U.S.C. § 2702) and the CFAA (18 U.S.C. § 1030, *et seq*).

65.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

66.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## COMMON FACTUAL ALLEGATIONS

***Background: Underlying Technology Employed by Defendant for the Purpose of Disclosing Plaintiffs' and Class Members' Private Information to Facebook.***

67.     Defendant purposely installed the Pixel and Conversions API tools on many of its webpages within its Website and programmed those webpages to surreptitiously share its patients' private and protected communications with Facebook, including communications that contain Plaintiffs' and Class Members' PHI and PII.

68.     Defendant uses the Website to connect Plaintiffs and Class Members to Defendant's digital healthcare platforms with the goal of increasing profitability.

69.     In order to understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

***Facebook's Business Tools and the Pixel***

70.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[10]

71.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

72.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

---

[10]   FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022)

73.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[11] Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[12]

74.    One such Business Tool is the Pixel which "tracks the people and type of actions they take."[13] When a user accesses a webpage that is hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling from the user's browser to Facebook's server.

75.    Notably, this transmission only occurs on webpages that contain the Pixel. Thus, Plaintiffs' and Class Member's Private Information would not have been disclosed to Facebook via the Pixel but for Defendant's decisions to install the Pixel on its Website.

76.    Similarly, Plaintiffs' and Class Member's Private Information would not have been disclosed to Facebook via Conversions API but for Defendant's decision to install and implement that tool.

---

[11]    FACEBOOK,    SPECIFICATIONS    FOR    FACEBOOK    PIXEL    STANDARD    EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Nov. 14, 2022); see FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR    FACEBOOK    PIXEL    SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 14, 2022).

[12] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/. (last visited Nov. 14, 2022)

[13] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

77.     By installing and implementing both tools, Defendant caused Plaintiffs' and Class Member's communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via Conversions API.

78.     As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

***Defendant's method of transmitting Plaintiffs' and Class Members' Private Information via the Tracking Pixel and/or Conversions API i.e., the interplay between HTTP Requests and Responses, Source Code, and the Pixel***

79.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

80.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

81.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests

can send a large amount of data outside of the URL. (For instance, uploading a PDF for filing a motion to a court)

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[14]

82.     A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as "Find a Doctor" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website.

83.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

84.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's Pixel is source code that does just that. The Pixel acts much like

---

[14] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

a traditional wiretap. When patients visit Defendant's website via an HTTP Request to Banner's server, Defendant's server sends an HTTP Response including the Markup that displays the Webpage visible to the user and Source Code including Defendant's Pixel. Thus, Defendant is in essence handing patients a tapped phone, and once the Webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third-parties, including Facebook and Google.

85.    Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the patient associated with the Personal Information intercepted.

86.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Information, like Facebook, implement workarounds that savvy users cannot evade. Facebook's workaround, for example, is called Conversions API. Conversions API is an effective workaround because it does the transmission from their own servers and does not rely on the User's web browsers. Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Thus, the communications between patients and Defendant, which are necessary to use Defendant's Website, are actually received by Defendant and stored on its server before Conversions API collects and sends the Private Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

87. While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[15] Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also implement the Conversions API workaround.

88. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

89. Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

90. In this case, Defendant employed the Tracking Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook.

91. For example, when a patient visits https://www.garnethealth.org/ and selects the "Breast Cancer" button, the patient's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As depicted below, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

---

[15] *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Jan. 23, 2023).



*Figure 1. The image above is a screenshot taken from the user's web browser upon visiting* https://www.garnethealth.org/services/cancer-care/types-cancer/breast-cancer *(last accessed June 8, 2023).*

92.     The Facebook Tracking Pixel is embedded in Defendant's Source Code contained in its HTTP Response. The Pixel, programmed to automatically track and transmit the patient's communications with Defendant's Website to Facebook, executes instructions that effectively

open a hidden spying window into the patient's browser through which Facebook can intercept the visitor's data, actions, and communications with Defendant.[16]

93.     Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

94.     Consequently, when Plaintiffs and Class Members visit Defendant's website and communicate their Private Information, including, but not limited to, selecting physicians, selecting treatment locations, viewing health information on specified conditions, and text typed into search bar including conditions, symptoms, and treatments, third parties like Facebook receive the information.

### *Defendant Disclosed Plaintiffs' and Class Members' Private Information to Facebook Using the Pixel and/or Conversions API Tracking Practices*

95.     Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and Conversions API ("First Party cookies") on its Website and servers to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.[17]

96.     Defendant's Pixel has its own unique identifier (represented as id= 619938161903548), which can be used to identify which of Defendant's webpages contain the Pixel.

---

[16] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. The Facebook Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

[17] *Id.*

97.    The Pixel allows Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.[18] However, Defendant's Website do not rely on the Pixel in order to function.

98.    While seeking and using Defendant's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Defendant via its Website.

99.    Plaintiffs and Class Members were not aware that their Private Information would be shared with Facebook as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

100.    Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Facebook, nor did they intend for Facebook to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

101.    Defendant's Pixel and First Party cookies sent non-public Private Information to Facebook, including but not limited to Plaintiffs' and Class Members': (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); and (6) searched and selected physicians and their specialties conducted via the general search bar and drop down lists.

102.    Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information

---

[18] *Id.*

contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.[19]

103.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

104.    Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel and First Party cookies) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

### Defendant's Pixel Disseminates Patient Information via Its Website

105.    An example illustrates the point. If a patient uses the Website to Find a Provider, Defendant's Website directs them to communicate Private Information, including the service or health condition. Unbeknownst to the patient, each and every communication is sent to Facebook via Defendant's Pixel, including the conditions, symptoms, or physicians typed into the search bar.

---

[19] Defendant's Website track and transmit data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.



106.    In the example above, the user navigated to the Breast Cancer page from the Services tab.

107.    Next, the user selected "Find a Provider," and selected a physician that specialized in the particular condition in which the user is seeking treatment, "Breast Cancer Treatment".

108.    Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Pixel. The image below shows the "behind the scenes" portion of the website that is invisible to ordinary users. Importantly, each entry in the column represents just one instance in

which Defendant's Pixel sent this particular user's information to third parties like Facebook.



109.    Thus, without alerting the user, Defendant's Pixel sends each and every communication the user made via the webpage to Facebook, and the images below confirm that the communications Defendant sends to Facebook contain the user's Private Information.



110.    The first line of highlighted text, "id: 619938161903548" refers to Defendant's Pixel ID and confirms that Defendant has downloaded the Pixel into its Source Code for this particular webpage.

111.    On the same line of text, "ev= PageView," identifies and categorizes which actions the user took on the webpage ("ev=" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as searching for "Breast Cancer Treatment" and viewing the results for that search.

112.    The additional lines of highlighted text show Defendant has disclosed to Facebook that the user: (1) is a patient seeking medical care from Defendant via https://www.garnethealth.org/.

113.    Finally, the highlighted text ("GET") demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID), thereby allowing the user's communications and actions on the website



to be linked to their specific Facebook profile.

114.    The image above demonstrates that the user's Facebook ID (highlighted as "c_user=" in the image) was sent alongside the other data. [20]

---

[20] The user's Facebook ID is represented as the c_user ID highlight in the image below, and Plaintiffs has redacted the corresponding string of numbers to preserve the user's anonymity.

115.    To make matters worse, Defendant's Pixel even tracks and records the exact text



and phrases that a user types into the general search bar located on Defendant's homepage. In the

example below, the user typed "I Have Breast Cancer" into the search bar.

116.    Resultantly, that exact phrase is sent to Facebook, thereby allowing the user's

medical condition to be linked to their individual Facebook account for future retargeting and

exploitation. This is simply unacceptable, and there is no legitimate reason for sending this

information to Facebook.

▼ **Query String Parameters**    view source    view URL-encoded

id: 619938161903548

ev: PageView

dl: https://www.garnethealth.org/search-results?query=I%20have%20Breast%20Cancer

rl: https://www.garnethealth.org/providers?search=Breast+Cancer+Treatment&affiliation%5B1%5D=1&lat=&lng=&hg_feat
ures_google_places_geocoder=&proximity=25&office_or_location_name=&insurance_accepted=All&languages_spoken=Al
l

| :Authority: | www.facebook.com |
|---|---|
| :Method: | GET |
| :Path: | /tr/?id=619938161903548&ev=PageView&dl=https%3A%2F%2Fwww.garnethealth.org%2Fsearch-results%3Fquery%3DI%2520have%2520Breast%2520Cancer&rl=https%3A%2F%2Fwww.garnethealth.org%2Fproviders%3Fsearch%3DBreast%2B Cancer%2BTreatment%26affiliation%255B1%255D%3D1%26lat%3D%26lng%3D%26hg_features_google_places_geocoder%3D%26proximity%3D25%26office_or_location_name%3D%26insurance_accepted%3DAll%26languages_spoken%3DAll&if=false&ts=1686241021602&sw=1920&sh=1080&v=2.9.106&r=stable&ec=0&o=28&fbp=fb.1.1686172957914.646776000&it=1686241021218&coo=false&rqm=GET |
| :Scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Cookie: | sb=uV12ZP5rVh-bWcaWfpzDmFyw; datr=uV12ZMv8ax80RC-ANrG3U8Ky; c_user=1██████████████ usida=eyJ2ZXIiOjEsImIkIjoiQXJ2aHFkZjE4cGk3b3XIiLCJ0aW1IljoxNjg1NDgyNjM0IiwidXNlcl9pZCI6MT
    usida=eyJ2ZXIiOjEsImIkIjoiQXJ2aHFkZjE4cGk3bXIiLCJ0aW1IljoxNDgyNjM0IiwidXNlcl9pZCI6MTIjMT
    usida=eyJ2ZXIiOjEsImlkIjoiQXJ2aHFkZjE4cGk3bXIiLCJ0aW1IljoxNDgyNjM0IiwidXNlcl9pZCI6MTIjMT
    usida=eyJ2ZXIiOjEsImlkIjoiQXJ2aHFkZjE4cGk3bXIiLCJ0aW1lljoxNDgyNjM0IiwidXNlcl9pZCI6MTIjMT
    xs=16%3ABFLreiFkt5CtkQ%3A2%3A1685478854%3A-1%3A2441%3A%3AAcXZNweDTEUf8QEgHVG4h26g98Dy97p0i4z_oqWrag; fr=0jMyEz0zFns5MvZ5s.AWUztyUSkr-Suh4qRiu7HrpTAyl.Bkgfxl.5d.AAA.0.0.Bkgfxl.AWX6cJpTExs |
| Pragma: | no-cache |

117.    In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's  c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile

118.    Facebook receives at least six cookies when Defendant's website transmits information via the Pixel:

119.    When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies:[21]



120.    The fr cookie contains an encrypted Facebook ID and browser identifier.[22] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[23]

121.    The cookies listed in the two images above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

---

[21] The screenshot below serves as example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

[22] Data Protection Commissioner, Facebook Ireland Ltd: Report of Re-Audit (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited May 11, 2023).

[23] Cookies & other storage technologies, FACEBOOK.COM, https://www.facebook.com/policy/cookies/ (last visited May 11, 2023).

122.    Defendant also revealed its website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user:[24]

| _fbp | fb.1.1686172957914.646776000 | .garnethealth.org |

123.    Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.[25]

124.    The Facebook Tracking Pixel uses both first- and third-party cookies.

125.    Another example helps illustrate the point. Garnet Health hosts several classes and support groups that patients are encouraged to attend, including but not limited to: bariatric surgery support groups and seminars, mental illness supports groups, support groups geared at specific types of cancer (lung, breast, oral, etc.), breastfeeding classes and birthing courses, tours of the family birth center, support groups for Parkinsons, and more. When patients register for these classes online via Defendant's website, their information is transmitted to Facebook. For example, in the image above, the patient registered to attend a "bariatric surgery support group" geared at both "pre-op and post-op bariatric patients." Upon making the selection, the exact name of the event, "bariatric-surgery-support-group," is sent to Facebook.

---

[24] *Id.*
[25] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.



126.     In summation, Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

127.     The image below, gathered from a website visitor's own Facebook account after the fact, makes it patently clear that Defendant are actively sending patient communications to

Facebook, stating Garnet Health shared the user's information twice using Facebook business tools.



128.    At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but other evidence suggests Defendant is using additional tracking pixels and tools to transmit its patients' Private Information to additional third parties. For example, the image below indicates that Defendant is also sending its patients' protected health information to Google via Google Tag Manager.

129.    The image below contains the user's search query into the search box, "I Have Breast Cancer", and Defendant does not appear to have enabled the anonymize feature provided by Google Analytics because the text "aip:" does not appear in the image.

| ▼ Request Headers | |
|---|---|
| :Authority: | www.google-analytics.com |
| :Method: | GET |
| :Path: | /collect?
v=1&_v=j100&a=546295432&t=event&ni=1&_s=1&dl=https%3A%2F%2Fwww.garnethealth.org%2Fsearch-results%3Fquery%3DI%2520have%2520Breast%2520Cancer&ul=en-us&de=UTF-8&dt=Search%20Results%20%7C%20Garnet%20Health&sd=24-bit&sr=1920x1080&vp=1015x912&je=0&ec=Web%20Vitals&ea=TTFB&el=v1-1686241021379-4721626745311&ev=694&_u=SACAAEABAAAAACAAI~&jid=&gjid=&cid=1028560968.1686172957&tid=UA-165875540-1&_gid=1413413153.1686172958&gtm=45He3650n81N59S52J&z=991569495 |
| :Scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Pragma: | no-cache |
| Referer: | https://www.garnethealth.org/ |
| Sec-Ch-Ua: | "Google Chrome";v="113", "Chromium";v="113", "Not-A.Brand";v="24" |
| Sec-Ch-Ua-Mobile: | ?0 |
| Sec-Ch-Ua-Platform: | "Windows" |
| Sec-Fetch-Dest: | image |
| Sec-Fetch-Mode: | no-cors |
| Sec-Fetch-Site: | cross-site |
| User-Agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36 |

130.     Accordingly, Google receives patients' communications alongside the patients' IP address, which is also impermissible under HIPAA.

131.     Defendant does not disclose that the Pixel, First Party cookies, Google Tag Manager, or any other tracking tools embedded in the Website's source code tracks, records, and transmits Plaintiffs' and Class Members' Private Information to Facebook and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs and Class Members' private communications to Facebook or Google.

***Defendant's Conduct Violates its Own Privacy Policies and Promises***

132.    Defendant's website contains a page titled HIPAA Notice of Privacy Practices ("NOPP"), effective since July 2013 and law updated in 2022. The NOPP assures readers that "Garnet Health is committed to ensuring the privacy and security of patient health information."[26]

133.    At the outset, the NOPP assures Defendant's patients that:

The NOPP explains how we, Garnet Health, fulfill our commitment to respect the privacy and confidentiality of your protected health information. This NOPP explains how we may use and share your protected health information, as well as the legal obligations we have regarding your protected health information, and about your rights under federal and state laws. The NOPP applies to all records maintained by Garnet Health facilities, regardless of whether the record is written, computerized or in any other form. We are required by law to make sure that information that identifies you is kept private and to make this NOPP available to you.[27]

134.    Defendant's NOPP does not mention its use of the Facebook Pixel or Conversions API.

135.    Defendant's NOPP actually states:

Other uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written authorization, on a Hospital authorization form. **Specifically, uses and disclosures of your medical information for marketing purposes or involving a sale of your information will be made only with your written authorization.**[28]

136.    Defendant's conduct is unlawful because its NOPP does not inform patients of, and in fact misrepresents, Defendant's actions in concert with Facebook – namely the intercepting and disclosing of Plaintiffs' and Class Members' Private Information.

---

[26] https://www.garnethealth.org/about-us/compliance-policy/hipaa-notice-privacy-practices
[27] *Id*.
[28] *Id*. (emphasis added).

137. Additionally, Defendant violated its NOPP by unlawfully intercepting and disclosing Plaintiffs' and Class Members' Private Information to Facebook and third parties without acquiring the specific patients' consent or authorization to share the Private Information.

### Defendant Violated HIPAA Standards

138. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[29]

139. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

140. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[30]

141. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or his protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third*

---

[29] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[30] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited June 7, 2023)

*parties without obtaining authorization from each person on the list.* (Emphasis added).[31]

142.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").[32]

143.    The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

144.    In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Facebook Pixel.

### *Defendant Violated Industry Standards*

145.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

146.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

147.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

---

[31] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June 7, 2023)
[32] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 7, 2023)

148.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

149.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c) release patient information only in keeping ethics guidelines for confidentiality.

***Plaintiffs' and Class Members' Expectation of Privacy***

150.    Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

151.    Indeed, at all times when Plaintiffs and Class Members provided their PII and PHI to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

***IP Addresses are Personally Identifiable Information***

152.    On information and belief, through the use of the Facebook Pixel on the Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiffs' and Class Members' Computer IP addresses.

153.    An IP address is a number that identifies the address of a device connected to the Internet.

154.    IP addresses are used to identify and route communications on the Internet.

155.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

156.    Facebook tracks every IP address ever associated with a Facebook user.

157.    Google also tracks IP addresses associated with Internet users.

158.    Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

159.    Under HIPAA, an IP address is considered personally identifiable information:

a.    HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

b.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

160.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

*Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures*

161.    The sole purpose of the use of the Facebook Pixel on Defendant's Website was marketing and profits.

162.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

163.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

164.    By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

## TOLLING

165.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and PHI was intercepted and unlawfully disclosed to Facebook because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

167.    The Nationwide Class that Plaintiffs seeks to represent is defined as follows:

**All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent as a result of using Defendant's Website (the "National Class").**

168.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

169.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

170.    Numerosity, Fed R. Civ. P. 23(a)(1). The Nationwide Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over one million individuals whose Private Information may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

171.    Commonality, Fed R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

   a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

   b.   Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

   c.   Whether Defendant violated its privacy policy by disclosing the Private Information of Plaintiffs and Class Members to Facebook and/or additional third parties.

   d.   Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

   e.   Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

f.  Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

g.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

h.  Whether Defendant violated the consumer protection statutes invoked herein;

i.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.  Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k.  Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

172.  Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

173.  Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also

retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

174.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

175.   <u>Policies Generally Applicable to the Class</u>. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

176.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm

the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

177.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

178.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

179.    Unless a Class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

180.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

181.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information with respect to Defendant's privacy policy;

c. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

182.    Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

## COUNT I
## BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
### (On Behalf of Plaintiffs and the Class)

183.    Plaintiffs incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

184.    Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

185.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

186.    In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became a guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

187.    Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

46

188.    These disclosures were made for commercial purposes without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

189.    The unauthorized disclosures of Plaintiffs' and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiffs' and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

190.    The third-party recipients included, but may not be limited to, Facebook. Such information was received by these third parties in a manner that allowed them to identify the Plaintiffs and the individual Class Members.

191.    Defendant's breach of the common law implied covenant of trust and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

    a.  By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

    b.  By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

    c.  By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d.  By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members PHI;

e.  By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.  By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g.  By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h.  By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i.  By failing to keep Private Information confidential as required by N.Y. C.P.L.R. 4504;

j.  By failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 2803(3)(f); and

k.  By otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

192.     The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the healthcare provider and the patient.

193.     As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a.  Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.  Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c.   Defendant eroded the essential confidential nature of the provider-patient relationship;

d.  General damages for invasion of their rights in an amount to be determined by a jury;

e.  Nominal damages for each independent violation;

f.  Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g.  Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.  Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i.   Defendant's actions violated the property rights Plaintiffs and Class members have in their Private Information.

**COUNT II**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiffs and the Class)**

194.   Plaintiffs incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

195.   The ECPA protects both sending and receipt of communications.

196.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

197.   The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

198.   The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

199.   **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

50

200.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

201.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

202.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiffs' and Class Members' browsers;

    b.  Plaintiffs' and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

203.    Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

204.    Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

205.    Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

206.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

207.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

208.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

209.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

210.    Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

211.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Pixel tracking code.

212.    Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

213.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of the New York Patient's Bill of Rights, New York Public Health laws, and invasion of privacy, among others.

214.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

215.    Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

216.    Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and New York, including.

    a.    Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

    b.    Criminal violation of New York Computer Crime statutes, including: Unauthorized use of computer (N.Y. Penal § 156.05); Unlawful duplication (N.Y. Penal § 156.29); and Computer trespass (N.Y. Penal § 156.10);

    c.    Violation of the New York Patient's Bill of Rights, N.Y. Pub. Health § 2803-c;

    d.    Violation of law regarding New York Civil Practice Law and Rules § 4504;

    e.    Violation of the New York Deceptive Trade Practices Act, Gen. Bus. Law § 349; and

    f.    Invasion of Privacy.

217.    Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

218.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

219.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

    a.    Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

    b.    Disclosed individually identifiable health information to Facebook and Google without patient authorization.

220.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

221.    Under N.Y. Penal § 156.05, a person commits the offense of unauthorized use of a computer if he "knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization."

222.    Defendant violated the N.Y. Penal § 156.05 in that Defendant knowingly used and accessed Plaintiffs' and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

223.    Under N.Y. Penal § 156.29, a person commits the offense of unlawful duplication of computer related materials if he copies, reproduces or duplicates in any manner computer material that contains records of the medical history or medical treatment of an identified or readily identifiable individual or individuals with an intent to commit or further the commission of any crime under this chapter.

224.    Defendant violated N.Y. Penal § 156.29 by exceeding its authorization to access Plaintiffs' and Class Members' computers including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to make unauthorized copies of Plaintiffs' and Class Members' electronic data and to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

225.    Under N.Y. Penal § 156.10, a person commits the offense of computer trespass if he knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization and:

    a.   He or she does so with an intent to commit or attempt to commit or further the commission of any felony; or

    b.   He or she thereby knowingly gains access to computer material.

226.    Defendant violated N.Y. Penal § 156.10 when it knowingly and without Plaintiffs or Class Members' authorization inserted the fbp, ga, and gid cookies on Plaintiffs' and Class Members' computing devices.

227.    The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

228.    Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

229.    Under the New York's Rights of Patients in Certain Medical Facilities, N.Y. Pub. Health § 2803-c(3)(f), "[e]very patient shall have the right to have privacy in treatment and in caring for personal needs, confidentiality in the treatment of personal and medical records, and security in storing personal possessions."

230.    Defendant violated the New York Rights of Patients by disclosing Plaintiffs' and Class Members' Private Information to third parties without authorization or consent.

231.    Under New York Civil Practice Law and Rules Section 4504, "[u]nless the patient waives the privilege" medical professionals are not "allowed to disclose any information which he

acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

232.    Defendant violated N.Y. C.P.L.R. 4504 by disclosing Plaintiffs' and Class Members' Private Information to third parties without authorization or consent.

233.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their individually-identifiable patient health information on its Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiffs and Class Members did not consent to receive this information.

234.    Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

235.    As such, Defendants cannot viably claim any exception to ECPA liability.

236.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

> a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance

and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiffs or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

237.    As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
### INVASION OF PRIVACY
### Violations of N.Y. Civ. Rights Laws §§ 50, 51
### (On Behalf of Plaintiffs and the Class)

238.    Plaintiffs incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

239.    Plaintiffs and Class Members have a statutory privacy interest in their names, portraits, pictures, and voices under New York law.

240.    Defendant knowingly used Plaintiffs' and Class Members' names and other Private Information in the State of New York for advertising and trade purposes without first obtaining their written consent.

241.    Specifically, Defendant transmitted Plaintiffs' and Class Members' names and/or FID to third parties like Facebook for targeted advertising and other commercial purposes, as described herein.

242.    Defendant's use of Plaintiffs' and Class Members' names and Private Information did not serve any public interest.

243.    The unlawful tracking of Plaintiffs and Class Members' and disclosure of their names in connection with their Private Information has caused Plaintiffs and Class Members to suffer damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiffs and Class Members have also suffered nominal damages.

244.    Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Pixel onto its Website because the purpose of the Pixel is to track

and disseminate individual's communications with the Website for the purpose of marketing and advertising.

245.    Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

246.    Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiffs and Class Members are entitled to nominal damages.

247.    Plaintiffs and Class Members are entitled to exemplary and/or punitive damages as a result of Defendant's knowing violations of their statutory rights to privacy.

248.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and other third parties and the wrongful disclosure of the information cannot be undone.

249.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

250.    Plaintiffs, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Defendant from further intruding into Plaintiffs' and Class Members' statutory privacy interests.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (on behalf of Plaintiffs and the Class)

251.    Plaintiffs incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

252.    As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Private Information and compensation for their medical care.

253.    When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

254.    Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

255.    Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

256.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information without consent to third parties like Facebook.

257.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

258.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

259.    Plaintiffs incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

260.    Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

261.    Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

262.    Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

263.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

264.    The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would contravene equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

265.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
## NEGLIGENCE
### (On behalf of Plaintiffs and the Class)

266.    Plaintiffs incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

267.    Defendant owed Plaintiffs and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

268.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

269.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

270.    These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

271.    The third-party recipients included, but may not be limited to, Facebook.

272.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class members were damaged by Defendant's breach in that:

 a. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

 b. Plaintiffs and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c.   Defendant eroded the essential confidential nature of the provider-patient relationship;

d.   General damages for invasion of their rights in an amount to be determined by a jury;

e.   Nominal damages for each independent violation;

f.   Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g.   Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.   Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i.   Defendant's actions violated the property rights Plaintiffs and Class members have in their Private Information.

## <u>COUNT VII</u>
## VIOLATIONS OF THE NEW YORK CONSUMER LAW FOR DECEPTIVE ACTS AND PRACTICES GEN. BUS. LAW § 349
### (On behalf of Plaintiffs and the Class)

273.   Plaintiffs incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

274.   This cause of action is brought pursuant to the New York General Business Law § 349 ("NYGBL"), which New York courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

275. NYGBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

276. By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of NYGBL § 349, and the deception occurred within New York State.

277. By serving as Plaintiffs' and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

278. Plaintiffs and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

279. Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiffs and Class Members.

280. Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of New York and the United States.

281. The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding the Facebook Pixel and Conversions API, emanated and arose within the state of New York, within the scope of NYGBL § 349.

282. Defendant, operating in and out of New York, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of NYGBL § 349, including but not limited to the following: (a) knowingly promising to protect Plaintiffs' and Class Members' Private Information, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiffs' and Class Members' Private Information; and (c)

knowingly disclosing Plaintiffs' and Class Members' Private Information to third parties, including Facebook.

283. Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiffs' and Class Members' Private Information unless under a legal obligation to do so.

284. These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to HIPAA, the New York Patient's Bill of Rights, New York computer crime statutes, statutes regarding the confidentiality of medical records, and NYGBL § 349.

285. Defendant knew or should have known that its Website and the cookies and source code thereon was unlawfully wiretapping, intercepting, and disclosing Plaintiffs' and Class Members' Private Information.

286. Plaintiffs has standing to pursue this claim because as a direct and proximate result of Defendant's violations of NYGBL § 349, Plaintiffs and Class Members have been "aggrieved" by a violation of NYGBL § 349 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate NYGBL § 349.

287. Plaintiffs also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of NYGBL § 349, Plaintiffs and Class Members have lost money or property in the form monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

288. Plaintiffs and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other

tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiffs' and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner; (d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

289.    Plaintiffs brings this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

290.    The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

291.    Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

292.    Plaintiffs and Class Members seek relief under NYGBL § 349, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate NYGBL § 349; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate NYGBL § 349 as described above.

293.    Plaintiffs and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members:

D.   For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

DATE: August 7, 2023                          Respectfully Submitted,

*/s/ Vicki J. Maniatis*
Vicki J. Maniatis
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel.:    (865) 412-2700
vmaniatis@milberg.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*

Bryan L. Bleichner*
Philip J. Krzeski*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

Terence R. Coates*
Dylan J. Gould*
**MARKOVITS, STOCK &
DEMARCO, LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 4502
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Joseph M. Lyon*
**The Lyon Firm**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

***Counsel for Plaintiffs and the Class***

* *pro hac vice* forthcoming